**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 19-350-2** |
| **ABID STEVENS** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its undersigned attorneys, Jennifer Arbittier Williams, Acting United States Attorney for the Eastern District of Pennsylvania, Robert E. Eckert, Assistant United States Attorney for the district, and Ashley N. Martin, Special Assistant United States Attorney for the district respectfully requests that this Court sentence the defendant to a term of 147 months' imprisonment to be followed by 5 years of supervised release.

The defendant's conviction in this case is the latest result of a series of convictions, some involving very serious offenses, stretching back years.   The defendant, while armed with a firearm, assisted his co-defendants in robbing a corner store and then attempted to intimidate the store owner into not cooperating with the police.   In this case, where he senselessly put a gun in the face of a convenience store clerk and took the law in his own hands, Mr. Stevens demonstrated that he would use a firearm to assist others in a robbery.   The defendant committed these crimes, while on probation for a firearms offense in Philadelphia.   The defendant is a repeat offender of violent crime that relies upon the use of firearms.

The victim of defendant Stevens' most recent crime, Joel Ventura, provided a written victim impact statement.   He describes how his life was changed by the events of March 22, 2019.   Mr. Ventura can no longer do everyday things like go to the park or the supermarket with his family without living in fear for his life.   It is difficult to imagine a more traumatizing event

1

then what occurred on March 22, 2019.   A few feet away from Mr. Ventura, defendant Stevens, had a firearm extended towards Mr. Ventura's face, his finger on the trigger.   Likewise, co-defendant Smith was facing Mr. Ventura, his firearm extended with his finger on the trigger, pointing at Mr. Ventura's face.   Meanwhile, co-defendant Quinn stood between Stevens and Smith ready to take money from the cash register by force.   The government respectfully submits to the Court that a sentence of 147 months imprisonment is justified by the circumstances of this case and Mr. Stevens' prior criminal history.

Although the government believes that a sentence within the guideline range could be appropriate for Mr. Stevens, given the facts of this case and his criminal history, and considering that this Court sentenced co-defendant Smith to 147 months' imprisonment – a sentence that is below the applicable range for Stevens – a 147 month sentence is appropriate for Stevens. Unwarranted sentencing disparities among similarly situated defendants should be avoided, and the conduct of Mr. Stevens, while gravely serious, was not so egregious as that of Smith, therefore the government submits that a sentence below the advisory guideline range, but similar to, and consistent with, the sentence given to co-defendant Smith is the appropriate resolution of this case.   *See* 18 U.S.C. § 3553(a)(6).[1]

## I.   <u>INTRODUCTION</u>

On June 20, 2019, a grand jury sitting in the Eastern District of Pennsylvania returned an indictment charging defendants Donnie Smith, Abid Stevens, and Maurice Quinn with Hobbs

---

[1] In the sentencing proceeding for Mr. Smith, this Court determined that the final offense level of the Hobbs Act Robbery was 22.   Given that Mr. Smith's ultimate criminal history category was IV, this resulted in a guideline range of 147 to 162 months imprisonment.   ECF 171. Although Stevens' guideline range is higher, for the reasons set forth in this memo, the government argues that the appropriate sentence is the same sentence given to Mr. Smith.

Act robbery, in violation of 18 U.S.C. § 1951(a) (Count One), carrying, using, and brandishing a firearm during and in relation to the commission of a crime of violence, in violation of 18 U.S.C. § 924(c), (Count Two), and co-defendant Donnie Smith with felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).   ECF 14.   On January 27, 2020, the parties selected a jury and trial began against each of the three defendants on Counts One and Two of the indictment. ECF 92.   On February 4, 2020, the jury returned a verdict of guilty against each defendant on Counts One and Two.   ECF 116, 118, 119.   The jury further answered the interrogatory in the affirmative and found that defendant Stevens carried, used, and *brandished* a firearm, subjecting him to a seven-year mandatory minimum sentence on Count Two.   ECF 118.   A sentencing hearing is currently scheduled for March 10, 2021, at 10:00 a.m., before the Honorable Jan E. DuBois.   ECF 173.

## II.   <u>SENTENCING PROCEDURE</u>

The Third Circuit has set forth a three-step process which the district courts must follow in compliance with the Supreme Court's ruling in <u>United States v. Booker</u>, 543 U.S. 220 (2005):

(1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before <u>Booker</u>.

(2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-<u>Booker</u> case law, which continues to have advisory force.

(3) Finally, they are to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.

<u>United States v. Gunter</u>, 462 F.3d 237, 247 (3d Cir. 2006) (quotation marks, brackets, and citations omitted) (citing <u>United States v. King</u>, 454 F.3d 187, 194, 196 (3d Cir.

2006); United States v. Cooper, 437 F.3d 324, 329-30 (3d Cir. 2006)).

For the reasons set forth below, the government requests that this Court impose a sentence of 147 months' imprisonment.

## III.   MAXIMUM AND MANDATORY MINIMUM PENALTIES

On Count One, Hobbs Act robbery, the defendant faces a total maximum sentence of 20 years imprisonment, a three-year term of supervised release, a $250,000 fine, and a $100 special assessment.

On Count Two, carrying, using, and brandishing a firearm during the commission of a crime of violence, the defendant faces a maximum sentence of life imprisonment, a mandatory minimum term of seven years' imprisonment to be imposed consecutive to any other sentence, a five-year period of supervised release, a $250,000 fine, and a $100 special assessment.

Thus, the defendant faces a total maximum sentence of life imprisonment, a mandatory minimum term of seven years imprisonment consecutive to any other sentence, a five-year term of supervised release, a $500,000 fine, and a $200 special assessment.

## IV.   SENTENCING GUIDELINES CALCULATIONS

The government agrees with the sentencing guideline calculations of the Probation Department, as reflected in the Presentence Report (PSR).   These calculations established that Stevens has a Total Offense Level of 24, and a Criminal History Category of VI, resulting in an advisory guideline range of 100 to 125 months' imprisonment.   PSR ¶ 91.   Due to the consecutive mandatory minimum term of incarceration of 84 months on Count Two, the effective guideline range becomes 184 to 209 months' imprisonment.   PSR ¶ 91.

During the sentencing of codefendant Smith, this Court determined that the abduction

4

enhancement under USSG § 2B3.1(b)(4)(A) should not have been applied, disagreeing with the government and the PSR.[2]   Instead, the Court ruled that the two-level enhancement under USSG 2B3.1(b)(4)(B) applied to the facts of this case: if any person was physically restrained to facilitate commission of the offense or to facilitate escape[,]" two levels are added.   *United States v. Copenhaver*, 185 F.3d 178, 180 (3d. Cir. 1999).   The government requests that this Court apply the same rationale and the same two-level enhancement here.   Thus, the final offense level on Count One: Hobbs Act Robbery is 22.

The defendant submitted an objection to the PSR's determination of criminal history. PSR, Objection #3, pg. 26.   Stevens argues that his three convictions, listed in para. 40-42 should not be scored separately.   However, Stevens' position is plainly incorrect because, as the PSR notes, and the United States Sentencing Guidelines outline,, because each conviction was separated by an intervening arrest they are scored separately.   USSG § 4A1.2(a)(2); PSR, Response to Objection #3, pg. 27.   The defendant's first conviction involved the possession of a firearm, carrying firearms in public, and reckless endangerment and arose from an arrest in Philadelphia on November 28, 2007.   PSR ¶ 40.   The defendant's second conviction, for possession of marijuana, arose from an arrest in Philadelphia on October 21, 2015.   PSR ¶ 41. Finally, the defendant's third conviction, for possession of cocaine, arose from an arrest on January 8, 2016.   PSR ¶ 42.   While the defendant plead guilty in the latter two cases on the same date, February 29, 2016, his date of conviction on the first conviction is actually April 7, 2008.   The only event that occurred on February 29, 2016, in the possession of firearm case that

---

[2] While the government agreed with the Probation Officer that the abduction enhancement was appropriately applied, this Court's decision that it does not apply to Smith's conduct renders it logically inapplicable to Stevens as well.

arose out of the November 28, 2007, arrest was that the Judge violated Stevens' probation but, according to the PSR, did not result in an additional sentence to incarceration.   PSR ¶ 40-42. Thus, because the offenses were all separated by intervening arrests, they are appropriately scored.   The PSR writer correctly determined that the criminal history category was VI for Stevens.   PSR ¶ 45.

## V.       ANALYSIS OF THE 3553(a) FACTORS

The government seeks a sentence of 147 months imprisonment.   The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."   Gall v. United States, 128 S. Ct. 586, 596 (2007). Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

This Court must also consider all of the sentencing considerations set forth in Section 3553(a).   Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the

offense.   18 U.S.C. § 3553(a).[3]

     1.     <u>Nature and Circumstances of the Offense</u>

          a.     <u>Defense Objection to Offense Conduct</u>

The defendant, both in his sentencing memorandum and in his responses to the Probation Officer argues that he was merely serving as a peacemaker in this case and objects to the offense conduct section of the pre-sentence report.   ECF 172 at 8-11; PSR Objection #1, pg. 24-25. The defendant's support for this argument cites Stevens' "overriding concern [that] there not be any violence."   PSR Objection #1, pg. 24.   Even if Stevens truly believed that Quinn had a right to money from the store, by obtaining that money only by pointing a weapon at the face of the clerk and demanding money, the defendant committed, and aided and abetted in the commission, of a robbery.   Stevens' argument continues, "It is clear that the draft presentence report was written without reviewing the surveillance videos and was written solely from the government's version of the offense."   PSR Objection #1, pg. 25.   As the PSR writer responded: "the defendant was found guilty of this offense.   The video footage was reviewed, and the offense conduct reflects this information."   PSR, Response to Objection #1.

In his sentencing memo and the objection, Mr. Stevens' simply restates arguments that

---

[3]   Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."   The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the "not greater than necessary" language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'"   <u>United States v. Dragon</u>, 471 F.3d 501, 506 (3d Cir. 2006) (quoting <u>United States v. Navedo-Concepcion</u>, 450 F.3d 54, 58 (1st Cir. 2006)).

were rejected by the jury.   Stevens' objection to the offense conduct section of the PSR is baseless and should be overruled.

        b.   <u>Statement of Facts</u>

On Friday, March 22, 2019, at approximately 5:25 p.m., a male, later identified by investigators as Maurice Quinn, entered RD Grocery store, 152 East Sharpnack Street, Philadelphia, Pennsylvania.   Quinn accessed the ATM upon entering the grocery store.   Quinn then approached the store employee behind the counter, Joel Ventura, who was the cashier at the store.   Quinn told Ventura that the ATM gave him fake cash.   Ventura told Quinn he was not the owner of the ATM and would call the owner to address the situation.   Quinn ordered Ventura to open the cash register to reimburse him with $100 cash.   Quinn told Ventura that he was going to take all of the money out of the register.   Quinn then went behind the counter and forcibly attempted to take cash out of the register and a Glock handgun from behind the counter that the storeowner, Isaliza Rodriguez, kept behind the counter for protection.   Ventura grabbed the Glock handgun from behind the counter before Quinn, which caused Quinn to leave the store.   Quinn was yelling and screaming in Ventura's face for a few minutes prior to leaving the store.   During this time, he pointed and put his fingers in Ventura's face repeatedly.

Approximately one minute later, Quinn returned to the store with two individuals, later identified as Donnie Smith and Abid Stevens. Smith entered first, followed by Stevens, and both were armed with black handguns.   Quinn entered the store behind Smith and Stevens.

At this time, Quinn went behind the cash register for the second time and tried to break into the cash register.   Quinn could not open the register, then exited the area behind the counter, and demanded that Ventura open it for him.   Ventura opened the cash register and gave

Quinn approximately $100 cash.

When Quinn told Ventura that the ATM gave him fake cash, Ventura called Rodriguez, who immediately drove over to the RD Grocery so that she could speak with Quinn.   While on her way to the RD Grocery store, she called 911.   As she was driving, she pulled up the live video feed from her store security camera, and upon seeing the three men enter, two of them with guns, she told the 911 dispatcher that there was a robbery in progress at her store.   When Rodriguez arrived at the store, the three males were still present in the store.   She immediately recognized Stevens and Quinn (though not by name) from their frequent trips to her store. Quinn left the store right away and Smith left shortly after.   Stevens remained behind inside of the store however passed his firearm to Quinn shortly before Quinn fled the store.

A short time after the robbery, Philadelphia Police Department (PPD) officers responded to the RD grocery store.   Upon arrival, the first officer on scene, Officer Ferreria received a flash description for a male inside of a dark-colored sedan parked further up the block.   He immediately went in that direction and saw a burgundy Ford Taurus, however he could not see inside of the vehicle because the windows were heavily tinted.   The officer went to the front of the car and looked in through the front windshield.   He observed a black male wearing all black clothing sitting in the driver seat of the vehicle.   He drew his service weapon and directed the man to step out of the vehicle.   Smith, the driver of the vehicle, turned the car on and the officer responded by opening the driver side door.   Upon doing so, the officer observed that Smith did not have a firearm in his hand so he holstered his weapon and attempted to remove Smith from the vehicle.   Smith pushed back on the officer and they briefly struggled.   Smith was able to get the car in drive and headed west on Sharpnack Street.   By this point, Officers Fernandez and

Xholo had arrived on scene and they followed Smith's vehicle.    The officers who followed Smith were able to call out the license plate number of a temporary New Jersey registration R641914.

At approximately 6:05 p.m., the Taurus, driven by Smith, was involved in an auto accident at 1021 West Horter Street.    Smith fled the scene of the accident.    By the time officers reached the area where Smith stopped his car (inside of a wooded area in Fairmount Park), Smith had fled.    Officer Fernandez quickly opened the door to make sure that no one else was in the car, and upon discovering no one, shut the door, without searching in the car.    The officers then held the car for Detective Cannon who arrived to photograph it.    Detectives Cannon and Gugger later obtained a search warrant for the vehicle and searched it at the PPD impound lot where they recovered the store owner's firearm and the hat embossed "Legend" worn by Smith (and observed on surveillance footage) during the robbery.

Further investigation revealed that Smith's vehicle was stopped by police for a traffic violation a week earlier.    After officers pulled him over, they stepped Smith out of the vehicle and placed him in their police vehicle.    Smith was wearing Muslim clothing at the time of the traffic stop.    Through investigation of this prior stop of Smith's vehicle, officers identified Smith and determined that Smith was a suspect in the robbery.    They put Smith's photo into an array and presented it to Officer Ferreria.    Officer Ferreria stated that he was not positive but he identified Smith's picture and said that looks like the individual that fled from the scene of the robbery.    The detectives then put Smith's photo into an array and showed it to Rodriguez, Ventura, and Emmanuel Sanchez (another store employee present for the robbery).    All three

witnesses identified Smith as the person in Muslim dress who robbed the store while armed with a gun.

During the initial stages of the investigation, 14th District officers familiar with that area viewed surveillance footage of the robbery.   Police Officer David O'Connor and Detective Goshert (NW Det.), upon viewing the video, both identified the second armed assailant as Abid Stevens (who resides on the unit block of Sharpnack Street).

On April 11, 2019, ATF Agent Orchulli and PPD Det. Justin Falcone met with Ventura. They showed him an eight-pack photo array that included a photo of Stevens.   Upon viewing Stevens' photo Ventura immediately pointed to it and said, "that's him."

On April 11, 2019, Agent Orchulli and Det. Falcone also presented a photo array that included Stevens to Rodriguez.   Within seconds of being handed the photograph of Stevens, she pointed to it and said, "that's him, I never forget a face."

Ventura also told investigators that Quinn accessed the ATM before the robbery. Investigators received the ATM transaction records from the owner of the ATM machine. Investigators located the transaction that corresponded to the time of the robbery.   Bank records associated with that transaction from the ATM in the RD Grocery revealed that Maurice Quinn is the name on the account accessed by the ATM machine on March 22, 2019.

Investigators did a photo search of Quinn using law enforcement databases and observed a photo of Quinn that appeared to be the same person that they observed on the surveillance video from the RD Grocery. Investigators then developed a photo array for each victim to review.

On April 16, 2019, ATF Agent Orchulli and PPD TFO Justin Falcone showed a photo array of eight males including Quinn to Isaliza Rodrigeuz, the owner of the store.   Rodriguez

identified Quinn as the robber stating, "that is him."   When asked by investigators if she was

confident, Rodriguez stated, "I'm positive that is the robber because I never forget a face."

On April 19, 2019, ATF Agent Orchulli and PPD TFO Justin Falcone showed a photo

array of eight males including Quinn to Joel Ventura.   Ventura identified Quinn as the robber

stating, "that is the guy."   When asked by investigators if he was confident, Ventura stated,

"Yes, that is him."

2. History and Characteristics of the Defendant

A. Criminal History

The defendant's criminal record includes seven adult convictions.   PSR ¶ 36-42.   The

adult felony convictions mainly involve firearms violations however the defendant was also

previously convicted of aggravated assault and fleeing/eluding police.   PSR ¶ 37.   Of note, at

the time of the crimes of this case, the defendant was on probation for a firearms offense

committed in Philadelphia where he received a state sentence of 30 to 60 months.   PSR ¶ 40.

Less than one year later, the defendant committed the offenses charged in this indictment.   Each

of the adult offenses are set forth in greater detail below.

B. Circumstances of Each Adult Conviction

On September 19, 2001, Stevens was convicted of possession of a controlled substance in

Montgomery County.   Because more than ten years have elapsed since this conviction it does

not receive any criminal history points.   PSR ¶ 36.

On April 18, 2002, the defendant plead guilty to carrying a firearm without a license,

reckless endangerment, and fleeing or eluding police.   The defendant was sentenced to a county

sentence of 11.5 to 23 months and five years' probation.   PSR ¶ 37.   In 2006, the defendant

violated the terms of his probation and was sentenced to an additional 6 to 12 months incarceration; because that violation occurred within 15 years of the commission of the instant offense, Stevens receives three criminal history points. In that case, the defendant carried a firearm, and when the police attempted to stop him, he crashed his vehicle into a parked car and fled before he was apprehended. PSR ¶ 37.

On April 18, 2002, the defendant was convicted, following a non-jury trial, of aggravated assault, carrying a firearm without a license, criminal mischief, simple assault, and reckless endangerment.[4] In that case, the defendant was sentenced to 11.5 to 23 months incarceration. PSR ¶ 38. Because the defendant was released from prison more than 15 years prior to the commission of the instant federal case, the defendant does not receive any criminal history points for this offense.

On December 5, 2005, the defendant was convicted of intentional possession of a controlled substance in Philadelphia. He was sentenced to two years of incarceration for this offense. Because the conviction occurred within 15 years of the instant federal offense, three points are added. PSR ¶ 39.

On April 7, 2008, the defendant was convicted of possession of firearms by a prohibited person, carrying firearms in public, and reckless endangerment. The defendant was sentenced to 30 to 60 months incarceration and five years' probation. PSR ¶ 40. In this case, the defendant carried two loaded firearms, one of which was stolen. He also operated a vehicle on a sidewalk and disregarded traffic laws while attempting to flee police officers. PSR ¶ 40.

---

[4] Although the circumstances of the conviction were not available to the PSR writer, the government provided a copy of the certified conviction record in CP-51-CR-0603331-2001 and will again provide a copy to Mr. Stevens' counsel concurrently with this filing.

Stevens receives three criminal history points for this offense.

Finally, on February 29, 2016, the defendant was convicted in two separate cases of possession of controlled substance, the first being possession of marijuana where he received 30 days incarceration (one criminal history point) and cocaine, for which he was sentenced to 23 months incarceration, concurrently with the marijuana conviction.  PSR 41-42.  As Stevens' asserts in his sentencing memorandum, Stevens plead guilty in both these cases on February 29, 2016, and on the same day was sentenced in the probation violation as well.  Stevens received a sentence of 23 months incarceration and four years probation.  Thus, because the two separate drug possession convictions were separated by an intervening arrest, *see* USSG § 4A1.2(a)(2), Stevens receives one point for the marijuana conviction and three points for the cocaine conviction.

Because Stevens remained on probation for the firearms offense at the time he committed the instant federal offense, two additional criminal history points are added.  PSR ¶ 44; USSG § 4A1.1(d).  Notwithstanding Stevens' 15 criminal history points, he argues that his record is that of a "petty criminal" and that he should receive a downward departure under USSG § 4A1.3(b).  ECF 172 at 6-8.  Stevens' arguments, on this basis, are absurd.  Mr. Stevens has amassed three separate felony firearms convictions involving firearms in Philadelphia that appropriately receive criminal history points.  In two of those cases, he attempted to elude the police.  Now the defendant, for the second time has again violated his probation in the 2008 firearms case by committing another criminal offense.  Even if this Court were to set aside the possession of marijuana conviction, which under the USSG would be improper, Stevens would still receive 14 criminal history points.  He receives this amount of points notwithstanding the

14

fact that he as an unscored aggravated assault and carrying a firearms conviction from 2002. PSR ¶ 38.   While a downward variance may be appropriate for other reasons set forth in this memo, Stevens' should not receive a downward departure based on his criminal history.

There is nothing "petty" about Stevens' criminal history.   Rather, his criminal conduct reflects the repeated use and possession of firearms, the repeated use and possession of controlled substances, and at least one instance of aggravated assault – a combination of inherently, and directly, dangerous and violent activity.   Far from a "petty" criminal history, Stevens has amassed a record that reflects a blatant and wonton disregard for leading a law abiding lifestyle.   Indeed he couldn't even refrain from committing crimes while he was on release for other crimes.   Stevens is not a "petty criminal," he revealed himself, based on his prior conduct, and conduct in this case, as a dangerous and serious offender.

3.    Personal Background

The defendant has lived in Philadelphia for his entire adult life, except for the period of time that he was incarcerated.   PSR ¶ 60.   The defendant is married and has two children, one of whom was living with Mr. Stevens and his wife at the time of his arrest.   PSR ¶ 64-65. Mr. Stevens' wife also has a nine-year-old son from a previous relationship who resides with Mr. Stevens' and his wife.   PSR ¶ 64.   The defendant reported a history of mental health issues and substance issues surrounding oxycodone.   PSR ¶ 77-78.

4.    Need for the Sentence Imposed to Reflect the Seriousness of the Offenses, to Promote Respect for the Law, and to Provide Just Punishment for the Offenses

Stevens' offenses of conviction are gravely serious.   After having been convicted of multiple firearms offenses in Philadelphia, aggravated assault, and fleeing and eluding police, the aided and abetted co-defendant Quinn in stealing money from a corner store at gunpoint.   The

15

defendant, despite being on probation for a firearms offense for which he served state prison time, again used a gun to commit a felony offense.   Defendant Stevens' is again before the Court convicted of another gun crime, in addition to Hobbs Act robbery.   Here, he not only possessed a firearm, he used it to facilitate the robbery of a store, assist his co-defendant in perpetuating a scam to steal money, and then pass that firearm off to his co-defendant prior to the arrival of the police.   This Court is well aware that gun violence and robberies committed with firearms plague the city and this District as a whole.   It is imperative that the defendant follow the law to ensure that he does not inflict harm on yet another person while carrying a firearm. By sentencing the defendant to 147 months while the defendant is incarcerated, society will be protected and he cannot harm any other person.

It is clear from a review of the defendant's criminal history, that he has absolutely no respect for the law and is greatly in need of a lengthy term of incarceration.   The defendant routinely committed crime, was arrested, prosecuted, convicted, sentenced, and eventually placed on supervision, and through it all, repeatedly returned to crime.   He, while on probation, and directed by a court to refrain from crime, committed additional crimes.   His history shows he has no respect for the law.

Now, Stevens claims that he was a peacemaker, "someone endeavoring to solve a problem."   ECF 172 at 8.   This argument says nothing about the jury's finding, unanimously, that Stevens' held, carried, used, and brandished a firearm at an innocent victim in an effort to steal money.   He says nothing of videotaped evidence of him and his codefendants holding firearms and pointing them at the head of an innocent person in order to steal $100.   The argument that the PSR is filled with the government's version of events and completely

16

disregards the unanimous verdict convicting him of those very same facts which *proved* his violent activities.   The Court's sentence is an opportunity to correct the defendant's misapprehension of what he did and the crimes he committed and in doing so, protect society from further criminal behavior by Mr. Stevens.

For the reasons set forth above, a sentence of 147 months imprisonment is necessary in this case "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."

5.    Need to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant

The recommended sentence affords adequate deterrence to others who would commit similar offenses, and protects the public from any further crimes of the defendant for at least as long as he is incarcerated. 18 U.S.C. § 3553(a)(2).   The defendant's prior criminal history reveals that he is in great need of specific deterrence.   He has been previously prosecuted and failed, repeatedly, to lead a law abiding life.   This Court now has an opportunity to impose a sentence that will force the defendant to rehabilitate and be deterred, finally, from committing crime.   The requested sentence of 147 months incarceration is sufficient but not greater than necessary to meet that need.

6.    Need to Provide the Defendant with Educational or  Vocational Training, Medical Care, or other Correctional Treatment in the Most Effective Manner

It is unknown whether Stevens could benefit from any additional educational or vocational programs, or whether he is interested in pursuing any such programs.   The defendant did work at Versatile Renovations in Philadelphia between 2016 and his arrest in 2020, earning $3,200 in unreported wages.   PSR ¶ 83.   The defendant received interior finishing and

roofing/siding training while incarcerated at SCI Somerset.   PSR ¶ 82.   It certainly seems that

he could benefit from additional vocational training while incarcerated and/or while on

supervised release.   This would aid the defendant in reintegrating into society.   The

recommended sentence will not inhibit from pursuing these goals and needs, if desired, while in

the custody of the Bureau of Prisons or following his eventual release.

       7.     Need to Avoid Unwarranted Sentence Disparities Among Defendants with
              <u>Similar Records who have been Found Guilty of Similar Conduct</u>

Sentencing consistency is extremely important in the overall administration of justice.

Any sentence imposed on defendant Stevens must reflect consideration of the sentences imposed

upon similarly situated defendants who brought to the table the same types of sentencing

considerations as those presented by Stevens, particularly the recidivist nature of his actions, that

is, his multiple previous convictions for firearms offenses, and the commission of this offense

while on probation for a weapons' offense. Sentence disparities among such individuals must be

avoided.

As previously stated, the government believes that, in fashioning an appropriate sentence

for Stevens, this Court must consider the sentence that it awarded Mr. Smith.   In that

proceeding, this Court determined that a bottom of the guidelines sentence, after considering all

of the appropriate factors under 18 U.S.C. § 3553(a), was the appropriate sentence.   While Mr.

Stevens' conduct was egregious, it was not equal to that of Mr. Smith.   However, Smith

presented to this court with a criminal history that was lesser than Stevens'.   In evaluating the

balance of their respective roles in the crimes of conviction and their criminal histories, the

government submits that a 147 months sentence – ultimately equal to Smith's sentence – is

appropriate. Thus, the government submits that a variance downward to 147 months is the

18

appropriate sentence for Mr. Stevens, given that his criminal history score is significantly higher than that of Mr. Smith.

## VI.    <u>CONCLUSION</u>

Therefore, in sum, all of the appropriate considerations of sentencing favor the imposition of a sentence of 147 months imprisonment.   Stevens' decision to possess a firearm and use it to commit a crime, robbery, while on probation for a firearms offense in Philadelphia, demonstrates that a significant sentence of incarceration is warranted and is the only way to protect the public from this defendant. The requested sentence is fair and appropriate in the context of this prosecution, in the context of the offense, and in the position of the defendant in relation to his already sentenced co-defendant.   Most importantly, however, the recommended sentence is sufficient but not greater than necessary to meet the purposes of sentencing.

Respectfully submitted,

JENNIFER ARBITTIER WILLIAMS
Acting United States Attorney


 /s Robert E. Eckert
Robert E. Eckert
Assistant United States Attorney


Ashley N. Martin
Ashley N. Martin
Special Assistant United States Attorney

Dated: March 3, 2021

19

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the government's sentencing memorandum has been served via electronic filing and electronic mail on this date on counsel for the defendant:

Barnaby Wittels, Esq.
Barnabyw@aol.com


  /s Robert E. Eckert
Robert E. Eckert
Assistant United States Attorney

Date: March 3, 2021

20